**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| DISABILITY RIGHTS FLORIDA, INC.,<br><br>*Plaintiff*,<br><br>v.<br><br>KATHRYN WILLIAMS, in her official capacity as Interim Secretary of the Florida Department of Children and Families,<br><br>*Defendant*. | Case No.: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. INTRODUCTION

1. For years, people with disabilities found incompetent to proceed in their criminal cases have remained trapped in county jails long after courts have ordered the State to admit them to mental health treatment facilities, in clear violation of the United States Constitution and Florida law.

2. The Florida Department of Children and Families (DCF) is obligated to promptly treat people charged with criminal offenses who, due to mental illness, cannot understand their charges or aid in their defense—i.e., they are incompetent to proceed. Instead of admitting them to state hospitals as required by law, DCF abandons these individuals with severe mental health disabilities—who are presumed innocent—to suffer for months at a time in under-resourced jails while their psychiatric symptoms deteriorate and become even more difficult to treat. DCF's treatment delays not only exacerbate the

risks stemming from this vulnerable population's disabling conditions, the delays also often cause physical and mental harm that would otherwise be avoided.

3. Under Florida law, when a court finds a defendant "incompetent to proceed" ("incompetent") and commits them to a state hospital, all criminal proceedings are paused unless and until the defendant is sufficiently stabilized and treated so they can meaningfully participate in their case. Florida law requires DCF to admit such defendants from the jail to a state hospital within 15 days of receiving the commitment paperwork from the court.

4. DCF, however, exceeds this deadline by an average of over 100 days, frequently taking six months or longer for hospital admissions. Indeed, over the last few years, DCF has maintained a fluctuating waitlist of between 650 and 880 people across Florida who are waiting an average of around four months for court-ordered competency restoration treatment, well beyond the statutory 15-day deadline and in violation of these individuals' right to due process under the United States Constitution. Unable to proceed in their criminal cases, DCF's practice of delaying state hospital admissions relegates people with several mental illness to legal limbo.

5. While languishing for months in jail without a criminal conviction, people found incompetent commonly suffer from debilitating symptoms such as hallucinations, delusions, mania, suicidality, depression, confusion, paranoia, dementia, incoherent speech, poor self-hygiene, self-starvation, and sleep deprivation. Many suffer severe injuries due to suicide attempts or act out as a result of their mental health disability, often leading to new criminal charges that perpetuate the cycle of decompensation. Some

are subject to victimization and jail violence. Jail staff, who are not equipped to provide the intensive treatment that these individuals with disabilities require, struggle to manage their symptom-related behaviors and often end up segregating them in solitary confinement. As a result, their symptoms worsen, making recovery even more difficult and expensive to the public, ultimately lengthening the amount of time these individuals remain incompetent and extending their overall confinement.

6. DCF's failure to timely admit and treat people found incompetent is a recurring pattern that first began nearly 50 years ago. Repeatedly, DCF has fallen back on the excuse that it lacks sufficient resources to build and staff enough state hospital beds to meet demand. But even if true, DCF has repeatedly failed to fully implement state-authorized, evidence-based treatment alternatives that could safely reduce its waitlist. Regardless of its resources, DCF cannot surrender its constitutional obligation to provide the treatment that courts have determined it must provide—based on the professional judgment of court-appointed mental health experts—before the State may subject these individuals with severe mental illness to any potential punishment for their alleged offenses.

7. DCF's failure to timely admit people found incompetent from county jails to state hospitals violates these individuals' due process rights guaranteed by the Fourteenth Amendment to the United States Constitution. DCF has a duty to provide state-mandated treatment and competency restoration services to people found incompetent within a reasonable period of time, which must be measured in days, not weeks or months.

8. Thus, Plaintiff Disability Rights Florida, Inc. (DRF), on behalf of its constituents with serious mental illness incarcerated in county jails across Florida, seeks declaratory and injunctive relief to end DCF's extended delays in providing appropriate mental health treatment and competency restoration services.

## II. JURISDICTION AND VENUE

9. Plaintiff brings this action under 42 U.S.C. § 1983 to redress the deprivation of rights guaranteed by the Fourteenth Amendment to the United States Constitution.

10. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

11. Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claim have occurred in this District. On any given day, at least 150 (or 25% of) people found incompetent are waiting months for transfers to state hospitals from county jails located within this District, including around 50 such individuals waiting each day in the Miami-Dade Corrections and Rehabilitation Department. In addition, two of the five state hospitals where DCF provides competency restoration services are in this District, including South Florida Evaluation and Treatment Center in Miami-Dade County.

## III. PARTIES

### *Plaintiff*

12. Plaintiff DRF is the Protection and Advocacy System (P&A) mandated under federal law to "ensure that the rights of individuals with mental illness are

protected." 42 U.S.C. § 10801(b)(1). The Protection and Advocacy for Individuals with Mental Illness Act (PAIMI), 42 U.S.C. § 10801, *et seq*., establishes and funds independent agencies and systems within each state to protect and advocate for the rights of individuals with mental illness. 42 U.S.C. § 10804(a)(1). DRF, as the state's P&A, is empowered by PAIMI to investigate incidents of abuse and neglect of individuals with mental illness, and to pursue "administrative, legal, and other appropriate remedies" on behalf of and to ensure protection of individuals with mental illness both broadly and individually. 42 U.S.C. § 10805(a)(1)(A)-(C).

13. As a P&A, DRF is tasked under law to protect and advocate for the rights of individuals with mental illness and to ensure the enforcement of the Constitution and federal and state statutes. 42 U.S.C. § 10801(b)(2)(A). DRF has the legal responsibility to investigate allegations of abuse and neglect involving individuals with mental illness. *Id.* § 10801(b)(2)(B). DRF is also responsible for pursuing administrative, legal, or other appropriate remedies to protect and advocate on behalf of individuals with mental illness to address abuse, neglect, or other violations of rights. 42 C.F.R. § 51.31(a).

14. To fulfill these legal responsibilities, DRF has the authority to sue the State and its agents "on behalf of its constituents" to protect individuals with mental illness who should be receiving care and treatment from the State or its agents. *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999) (finding a P&A, and Disability Rights Florida specifically, may "sue on behalf of its constituents like a more traditional association may sue on behalf of its members"); *see also* 42 U.S.C. § 10805(a)(1)(B).

15. Consistent with legal requirements, DRF has a multi-member board of directors that includes people with disabilities. DRF provides opportunities for the public, including its stakeholders, to comment on its goals and objectives. One of DRF's primary responsibilities is to investigate the failure of public entities to comply with laws protecting DRF's members, clients, and constituents.

16. Consistent with legal requirements, DRF also has an advisory council, known as the "PAIMI Advisory Council" or "PAC," that is designed to "advise the system on policies and priorities to be carried out in protecting and advocating the rights of individuals with mental illness." 42 U.S.C. § 10805(a)(6)(A). This PAIMI Advisory Council includes the required individuals who are knowledgeable of the needs of those with mental health disabilities. *See* 42 U.S.C. § 10805(a)(6)(B).

17. Consistent with legal requirements, DRF also has procedures for public comment on the priorities and activities of DRF and grievance procedures for current and prospective clients. 42 U.S.C. §§ 10805(a)(8), (9).

18. As authorized by federal legislation and Eleventh Circuit precedent, DRF brings this action on behalf of its clients and constituents of the P&A who have been found incompetent, committed to mental health treatment facilities ("state hospitals") operated by the Florida Department of Children and Families, and are incarcerated in county jails as they await transfer to state hospitals under Florida Statutes sections 916.12(1), 916.13, 916.107 and/or 916.302.

19. People who have been found incompetent and who are awaiting transfer to a state hospital have a "mental illness." Fla. Stat. § 916.12(2)(2026);[1] *see also* 42 U.S.C. § 10802(4) (under PAIMI, defining an "individual with a mental illness" as an individual "who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State"). The jails where DRF's clients and constituents are confined while they wait for state hospital admission, and where they are entitled to care and treatment for mental illness, are "facilities" as defined in PAIMI (42 U.S.C. § 10802(3)).

20. Over the last several months, DRF and its counsel have interviewed at least 129 of its clients and constituents in 25 counties across Florida who have been found incompetent to proceed and committed to state hospitals operated by the Florida Department of Children and Families. Of those 129 individuals, DRF was able to obtain sufficient information to determine the average amount of time that 108 of them waited between when the court found them incompetent and when DCF admitted them to an appropriate treatment facility: at least 124 days. [2] Seventy-nine of those waited over 100

[1] People who have been determined incompetent to proceed may also have an "intellectual disability or autism." Fla. Stat. § 916.3012(1). But the Agency for Persons with Disabilities, as opposed to the Florida Department of Children and Families, is "responsible for training forensic clients who are developmentally disabled due to intellectual disability or autism and have been determined incompetent to proceed," and is not the subject of this litigation. *See id.* § 916.106(1).

[2] This average is a conservative projection, as DRF does not have exact transfer dates for 39 of its clients. This is because at the time of filing these clients were either 1) still pending transfer to the state hospital or 2) transferred to the state hospital after DRF met with them at the jail and DRF could not confirm their current location/transfer date. In both cases, however, DRF can rely on the date that it most recently interviewed these clients in the jail, even though their transfer delay is longer by an unknown amount of time, to calculate an average wait of *at least* 124 days. DRF was able to determine exact transfer dates for 69 clients, for which the average transfer delay jumps to 128 days.

days, and 29 waited more than 150 days (over five months). The longest wait-time was 246 days (eight months). Even the shortest wait-time within this group was 51 days, more than tripling the 15-day time limit permitted under state law.[3] DRF has also identified three individuals who died in county jails while DCF delayed transfer beyond 15 days.

21. Unless enjoined by this Court, Defendant will continue to subject Plaintiff's clients and constituents to violations of their constitutional rights.

***Defendant***

22. Defendant Kathryn Williams is the Interim Secretary of DCF and is sued in her official capacity for the purpose of obtaining injunctive relief. DCF is an agency of the State of Florida that is "responsible for the treatment of forensic clients who have been determined incompetent to proceed due to mental illness[.]" Fla. Stat. § 916.106(7)(2026). As the Interim Secretary of this agency, Defendant Williams is responsible for DCF's general operations, including treatment and competency restoration for people found incompetent and committed to state hospitals. Defendant Williams has the legal authority to implement the relief sought herein.

## IV. CONSTITUTIONAL AND STATUTORY LAW RELATED TO COMPETENCY DETERMINATION AND RESTORATION

23. To have capacity, a criminal defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a

[3] This is all in addition to the long period of time that it takes for court-appointed experts to evaluate these individuals for competency, during which they are also in jail. *See* paras. 25 and 65-66 below.

"rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960).

24. Chapter 916 of the Florida Statutes provides the statutory framework for addressing individuals who lack capacity. Under section 916.12(1), "[a] defendant is incompetent to proceed ... if the defendant does not have sufficient present ability to consult with her or his lawyer with a reasonable degree of rational understanding or if the defendant has no rational, as well as factual, understanding of the proceedings against her or him." Fla. Stat. § 916.12(1).

25. To determine competency, the criminal court appoints at least two, but no more than three, experts to evaluate the defendant, unless the parties stipulate to the findings of one expert. Fla. Stat. § 916.12(2). Each judicial circuit maintains a registry of experts and compensates them for any services performed. "If an expert finds that the defendant is incompetent to proceed, the expert shall report on any recommended treatment for the defendant to attain competence[.]" *Id.* § 916.12(4).

26. Treatment recommendations may include community-based mental health services. Fla. Stat. § 916.12(4)(d). But for those deemed incompetent and charged with a felony, the court may involuntarily commit them for treatment in a state mental health treatment facility. *Id.* § 916.13.

27. The standard for involuntary commitment under section 916.13(1) requires:

> a finding by the court of clear and convincing evidence that:
> (a) The defendant has a mental illness and because of the mental illness:
> 1. The defendant is manifestly incapable of surviving alone or with the help of willing and responsible family or friends,

> including available alternative services, and, without treatment, the defendant is likely to suffer from neglect or refuse to care for herself or himself and such neglect or refusal poses a real and present threat of substantial harm to the defendant's well-being; or
>
> 2. There is a substantial likelihood that in the near future the defendant will inflict serious bodily harm on herself or himself or another person, as evidenced by recent behavior causing, attempting, or threatening such harm;
>
> (b) All available, less restrictive treatment alternatives, including treatment in community residential facilities, community inpatient or outpatient settings, and any other mental health services, treatment services, rehabilitative services, support services, and case management services ... which would offer an opportunity for improvement of the defendant's condition have been judged to be inappropriate; and
>
> (c) There is a substantial probability that the mental illness causing the defendant's incompetence will respond to treatment and the defendant will regain competency to proceed in the reasonably foreseeable future.

28. Once the court determines that the defendant meets this standard, it transmits its order and supporting documents ("commitment packet") to DCF. Fla. Stat. 916.13(2)(a); *see also* Fla. R. Crim. P. 3.212(c)(4).

29. Florida law states that it is the "policy of the state that the individual dignity of the [individual here] shall be respected at all times and upon all occasions, including any occasion when the forensic client is detained, transported, or treated. Clients with mental illness, intellectual disability, or autism and who are charged with committing felonies shall receive appropriate treatment or training." Fla. Stat. § 916.107(1)(a).

30. DCF may use jails as an "emergency facility" for only 15 days after receiving the commitment packet before it must admit committed persons to a state hospital. Fla. Stat. § 916.107(1)(a).

31. As an alternative to using state hospital beds, DCF is authorized to implement a "Forensic Hospital Diversion Pilot Program" within five judicial circuits that allows it to divert certain persons found incompetent, committed to state mental health facilities, and charged with felonies to "community-based alternative programs" for treatment and competency restoration services. Fla. Stat. § 916.185. On information and belief, only one of these programs is fully operational, located in Miami-Dade County with 16 treatment beds.

32. Instead of meeting its 15-day statutory deadline, including by diverting significant numbers of individuals found incompetent to community-based treatment, DCF maintains a list of approximately 650 to 850 persons awaiting admission to one of five state hospitals. According to DCF data, the average wait is around 120 days, and for many people the wait is much longer, often over 200 days. While they wait, these individuals languish and suffer in county jails without competency restoration treatment.

33. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972) and its progeny demonstrate that once an individual is deemed incompetent, they may be held only for the reasonable period of time necessary to determine, through competency restoration evaluation and treatment, whether they may regain capacity. These cases further establish that it is unconstitutional to hold people found incompetent in jails when their incarceration bears no reasonable relationship to restoring capacity, including when DCF's state hospital admission delays typically stretch anywhere from four to seven months.

## V. DCF'S RECURRING HISTORY OF LEAVING PEOPLE FOUND INCOMPETENT IN UNDER-RESOURCED JAILS INSTEAD OF PROMPTLY ADMITTING THEM TO APPROPRIATE MENTAL HEALTH TREATMENT

34. Florida's competency restoration system fails to meet the needs of people found incompetent to proceed in their criminal cases in Florida courts. Instead, DCF administers and operates a system where people with severe mental illness languish in jails that are not equipped to provide the care and treatment these individuals require to regain competency and avoid further deterioration.

35. Beginning in the 1960s, Congress began to integrate people with severe mental illness from high-cost and often inhumane psychiatric institutions back into their communities through its passage of the Community Mental Health Centers Act.[4] Unfortunately, however, since the enactment of this law, federal and state governments, including Florida, have provided only a pittance of the funding necessary to ensure sufficient community mental health treatment to meet a growing demand. As a result, arrests of people with severe mental illness have skyrocketed over the last several decades, replacing state psychiatric facilities with jails and prisons as the default mental health provider for the poor, uninsured, and unhoused.

36. Meanwhile, DCF also has failed to maintain sufficient treatment options for the large numbers of people who are found incompetent to proceed in their criminal cases and require competency restoration services. In fact, counsel for people found

---

[4] Pub. L. No. 88-164, 77 Stat. 282.

incompetent have been litigating the State's failure to timely admit them from county jails to state mental health facilities for nearly 50 years.

37. Though the State had legislative authority to use jails as an "emergency facility" for 45 days after incompetency findings, in 1981 the district court held that the State must admit persons from jails to treatment facilities within 72 hours. *Miller v. Carson*, 524 F. Supp. 1174, 1180 (M.D. Fla. 1981). The average wait-time at that time was 16.11 days. *Id.* at 1176.

38. In 1993, the Legislature amended Fla. Stat. § 916.107(1)(a) to allow the State to use jails as emergency facilities for only 15 days after DCF (then the Florida Department of Health and Rehabilitative Services, or HRS) receives an incompetency order, which became the de facto deadline for hospital admission. *State, Dep't of Health & Rehab. Servs. v. Maxwell*, 667 So. 2d 980, 980 (Fla. 4th DCA 1996). By 1995, the State was exceeding that deadline by around 40 days, with wait-times of approximately eight weeks. *State, Dep't of Health & Rehab. Servs. v. Bills*, 661 So. 2d 69, 70 (Fla. 2d DCA 1995).

39. Between 1999 and 2007, forensic commitments increased by 72%, including an unprecedented 16% increase between 2005 and 2006. By 2006, the transfer waitlist had ballooned to around 300 people, with at least 240 of them waiting longer than 15 days at an average wait-time of longer than three months.[5] Florida state courts in

---

[5] Florida Courts, *Mental Health Final Report* 29 (November 7, 2007), https://flcourts-media.flcourts.gov/content/download/2451044/file/SAMH_Mental_Health_Report_ADA-Compliant.pdf (archived here on Sept. 10, 2026).

multiple jurisdictions sanctioned or threatened sanctions against DCF for failing to admit these individuals within 15 days.

40. In response, the Secretary of DCF resigned and the legislature allocated more funding for forensic treatment beds and diversion programs. During the next decade, DCF managed to keep the transfer wait-time below 15 days.

41. Over time, however, DCF has failed to add enough forensic treatment beds or community alternatives to meet demand. Between 2010 and 2020, Florida's overall population increased by 14.6%.[6] During that period, the State paid consultants hundreds of thousands of dollars to analyze its mental health services. These consultants warned that state hospitals were facing capacity challenges, including increasing waitlists for forensic beds and difficulties discharging residents to placements in community-based services.[7] They also noted that Florida spent $19.63 per capita on community mental health funding, the lowest amount per capita nationwide and $73.76 below the national average of $93.39.[8]

42. DCF reported to the Legislature that forensic commitments had grown exponentially, with an almost 46% increase between 2021 and 2022 alone. Yet over a 19-year period, from 2006 to 2025, DCF added only around 360 forensic beds (i.e., the type

---

[6] Christine Hartley, Marc Perry, and Luke Rogers, *A Preliminary Analysis of U.S. and State-Level Results from the 2020 Census* 4 (United States Census Bureau, April 2021), https://www.census.gov/content/dam/Census/library/working-papers/2021/demo/pop-twps0104.pdf (archived here on September 11, 2026).
[7] North Highland Worldwide Consulting, Florida Department of Children and Families, Office of Mental Health Treatment Services, State-Operated Mental Health Treatment Facilities, Staffing Analysis Final Report, February 29, 2016, at p. 1.
[8] *Id.* at p. 26.

of bed used for people found incompetent). If the number of beds had kept pace with this increased population, it would have been an increase of approximately 580 forensic beds in just 2022.

43. Consistent with the exponential growth in forensic commitments and relatively stagnant number of forensic commitment beds, the competency restoration treatment waitlist was longer than it had ever been. For example, by 2021, 450 people were waiting for a treatment bed. By 2022, the waitlist ballooned to 639 people, with 525 (about 82%) waiting more than 15 days. Around the same time, the Legislature allocated $126 million to DCF to expand behavioral health services throughout the State.

44. Though the waitlist numbers decreased over the next two years, they began rapidly increasing again in 2024; by July of that year, DCF's waitlist for forensic beds increased by 36% (from 354 to 482 patients). State hospital bed capacity was at 98%.

45. In July 2025, in response to several petitions to criminal courts requesting immediate transfer after months-long delays, DCF submitted affidavits attesting that its waitlist of people found incompetent had grown to 881 people. Of those 881 individuals, DCF attested that 772 (about 87%) had been waiting longer than 15 days. DCF further attested that the average wait time was approximately four months (117 days for men, 125 days for women)—more than 100 days longer than the 15-day statutory deadline.

46. In fiscal year 2025-2026, the Legislature allocated another $78 million to DCF to expand bed capacity in the state hospitals requiring $58 million of that to be held in reserve until DCF provided certain metrics to the Legislature. As part of those metrics,

DCF provided a Behavioral Health Gap Analysis ("Gap Analysis")[9] to the Legislature. The Legislature released the funds after receiving this analysis and other metrics.

47. According to the Gap Analysis, the authors expected that although the Florida population annual growth rate would be 1.5% per year, the projected growth rate for the forensic waitlist would be 6% per year. Gap Analysis at 25. To maintain an "unsustainable" occupancy rate of 98%, "state mental health treatment facilities would need to add at least 1,602 additional forensic beds within the next five years to meet demand." *Id.* at 24, 26. To maintain a more sustainable and industry-standard occupancy rate of 85%, the same facilities would need to add 2,034 forensic beds by 2029. *Id.* at 26.

48. Despite its wait list of hundreds of individuals and projected gap of 2,000 forensic state hospital beds, in its 2026-2027 Legislative Budget Request, DCF requested no funding for additional state hospital forensic beds. Instead, it requested funding only for 85 community residential treatment beds for those who can be diverted to less-restrictive environments than state hospitals.

## VI. JAILS ARE EQUIPPED TO HOLD AND PUNISH, NOT TO MEET DCF'S OBLIGATION OF DELIVERING NECESSARY COMPETENCY RESTORATION SERVICES

49. State hospitals offer a level of care and treatment that county jails are neither designed nor equipped to provide. Once admitted to a state hospital, patients are assigned a multi-disciplinary team to provide ongoing psychiatric evaluation, diagnosis,

---

[9] Ernst & Young, LLC, *State of Florida Behavioral Health Gap Analysis* (Jan. 31, 2025), https://img1.wsimg.com/blobby/go/04dad2ad-e4b1-42e4-b8b4-42d4f2bb4407/Behavioral%20Health%20Gap%20Analysis%20-%20SB%20330%20Analys.pdf (archived here on September 11, 2026).

and treatment for mental illness through medication, individual counseling, and group therapy in a medically-supervised and structured environment. For those who require it, DCF may also petition the courts to administer ongoing involuntary medication, though because of the increased level of engagement between staff and patients, forced medication is rarely needed.

50. DCF also provides competency restoration services, including group and individual education sessions about the judicial process, role of the court, nature of their criminal charges, possible penalties, and legal rights. DCF further provides competency evaluations and reports for the courts about patients' progress.

51. In addition, DCF provides continuity-of-care services through case managers, linkages to community mental health providers, discharge planning, and transitioning to community placement that includes appropriate support services.

52. Importantly, DCF's services are provided in a therapeutic setting that is relatively calm and quiet, allowing for sleep at night and focus on competency restoration during the day. There are no law enforcement officers; only healthcare professionals, dressed in scrubs or civilian clothes, direct care workers, and unarmed security guards. Staff do not use handcuffs or shackles. "Patients," as they are referred to by DCF, may wear their own clothes. There are no cell bars. To aid in recovery, patients can communicate with their families (free-of-charge) throughout the day via phone calls and receive contact visits with their families.

53. Overall, state hospitals are designed for and provide necessary treatment and restoration services so that persons with mental illness can recover from acute mental

health symptoms and gain the competency they require under law to participate in their criminal cases.

54. Jails, in contrast, do not provide the required mental health treatment and competency restoration services that DCF provides to its patients in state hospitals. At most, jails provide only basic mental health stabilization that typically consists of periodic cell-front check-ins with rotating clinicians to prescribe and monitor medication use and prevent suicide and self-harm. The only purpose of jail mental health care is crisis intervention and maintaining a baseline level of mental health. This is, of course, in line with the jail's primary purpose of incarceration, in sharp contrast to the therapeutic setting of a state hospital.

55. Even though jails now serve as one of the largest providers of mental health services across the state, they are wholly inappropriate for most, if not all, individuals with mental illness who are trying to regain competency. To start, most jail staff are law enforcement officers with minimal to no mental health training. Their roles are to supervise, monitor, search, escort, count, enforce, restrict, and maintain order. They are fundamentally trained to use force, as opposed to clinical intervention, in response to non-compliant behaviors, even where mental illness causes such behaviors.

56. There is nothing therapeutic about the jail experience. Upon entry, "inmates," as they are referred to by jail staff, must submit to an invasive body cavity search and delousing shower. Incarcerated people with mental health disabilities spend nearly 24 hours a day in cramped, crowded, cement cellblocks divided by bars, thick glass, or steel. There is no privacy, even for toilets or showers. Throughout their

incarceration, they must submit to strip searches, handcuffs around their wrists, and shackles around their ankles. They spend most of their time idle, with few activities to occupy their minds.

57. The jail atmosphere is loud and tense. Staff must manage a constant and unpredictable churn of new arrests and discharges of individuals who may be experiencing substance use disorders, mental illness, or acute psychological crises—often during some of the most stressful moments of their lives. There is near-constant yelling. People fight. Doors open and loudly slam shut at all hours. Officers jangle keys, handcuffs, and chains as they walk and open doors. They shine flashlights in people's cells for security checks. Restful sleep is impossible.

58. Contact with loved ones is severely restricted. Phone calls cost money, more than many incarcerated people or their families can afford. Visits are non-contact or by video call only. Jail staff monitor all personal communications—nothing other than legal communications are confidential. Personal mail may be limited to only postcards. Many people have no contact with loved ones at all while incarcerated.

59. Many jails across the state are experiencing severe understaffing and overcrowding that overtax existing staff with overtime and increased workloads. Now, on top of this, due to DCF's lengthy state hospital admission delays, jails are faced with managing an ever-increasing population of individuals with serious mental illnesses who are often more difficult to manage due to their disabling conditions, increasing the burden on already strained jail staff. Essentially, DCF forces county jails to act as both

correctional and mental health treatment facilities for individuals who should be in DCF custody, without any increase in state resources.

60. In other words, DCF has been able to have its cake and eat it too—it has wantonly ignored its statutory obligations and violated the constitutional rights of individuals with mental illness who have been found incompetent, while relieving itself of the financial costs it would take to meet its legal obligations and placing a huge financial burden on each of the county jails throughout the State of Florida.

61. Ultimately, even the most adequately funded and well-run jails cannot match the level of mental health treatment, including competency restoration training, that DCF provides in state hospitals. In short, jails are not appropriate settings for individuals found incompetent and ordered to DCF custody to receive treatment.

## VII. DCF CAUSES ENORMOUS HARM BY FAILING TO TIMELY ADMIT PEOPLE FOUND INCOMPETENT TO STATE HOSPITALS

62. For people found incompetent due to severe mental illness, jail conditions can be so destabilizing that the longer they stay, the longer it takes for them to recover and become fit to stand trial, if ever. Thus, increasing transfer delays have a compounding effect on the individuals who need to receive competency treatment—the longer they wait for transfer, the more they decompensate and the longer it takes to stabilize them and restore them to competency once they do finally receive treatment. This then increases the amount of time it takes for that individual's bed to become available, further increasing the amount of time the next individual in line must wait for admission into appropriate treatment.

63. Most people with severe mental illness arrive in jails with challenges keeping in touch with reality, controlling their emotions and behaviors, or conforming to societal and institutional rules. Their arrests are often related to untreated mental health symptoms, substance use, or homelessness. When people with psychiatric disabilities languish in jails without intensive mental health care, those challenges magnify and worsen.

64. For those individuals initially showing signs of incompetency and unable to secure release on bond, the wheels of the criminal courts move slowly. It may be several weeks before they meet with their attorney or appear at an arraignment. It may be even longer before their attorney raises a doubt about their fitness to stand trial. Next, they must wait for experts to complete their evaluations and the court to make its findings for incompetency and involuntary commitment.

65. By the time DCF receives the commitment packet, starting the 15-day statutory clock for hospital admission, many people found incompetent have been in psychiatric crisis from un-treated or undertreated mental health symptoms for months. And by the time DCF finally admits them, they are commonly in worse condition than when initially adjudicated incompetent.

66. While DCF delays hospital admission, it leaves under-resourced jail staff to manage these individuals' worsening symptom-related behaviors. Many people found incompetent have a difficult time following official jail rules. They often act strangely or violently as a symptom of their mental illness, in ways that not only violate jail rules, but also endanger the safety of other incarcerated people and staff. Officers may respond to

these behaviors with disciplinary infractions and uses of force—including with pepper spray, violent takedowns, and emergency response teams in SWAT gear—that result in physical and psychiatric injuries to people found incompetent, and staff. Many people found incompetent receive new criminal charges for their untreated symptom-related behaviors while they wait for DCF to admit them to state hospitals.

67. Other individuals found incompetent withdraw and isolate themselves until they become nearly invisible to busy jail staff. Some stop eating or drinking enough food or water. Some stop reporting symptoms or accepting medical treatment, potentially exacerbating chronic medical conditions like diabetes or heart disease. Some become submissive or unable to fend off predatory behaviors, putting them at risk of theft, exploitation, and sexual assault. Some also start harming themselves or attempting suicide.

68. Eventually, given limited mental health services and no ability to forcibly medicate, jails frequently resort to isolating people found incompetent in solitary confinement until DCF finally admits them to appropriate therapeutic and rehabilitative care. Solitary confinement, by definition, is characterized as being locked in a cell, around the size of a king-size bed, for at least 23 hours a day with little access to human contact, exercise, and environmental stimulation.

69. Numerous studies confirm that isolating people with mental illness in solitary confinement often worsens and intensifies pre-existing mental health related symptoms such as depression, paranoia, psychosis, and anxiety. People in solitary confinement are also more likely to engage in self-harm and suicide than those in the

general jail population. Solitary confinement—even when used for attempted safety reasons—perpetuates a vicious cycle of decompensation, harmful behaviors, and increasingly difficult management problems for people with mental illness.

70. Regardless of any time in solitary confinement, the mere act of delaying necessary treatment for severe mental health symptoms increases the risk of lasting psychiatric injuries. Untreated psychotic disorders, for example, are progressive conditions that result in a downward spiral of declining symptoms, greater cognitive impairment, and diminishing ability to generally function. And the longer treatment is denied, the more entrenched and resistant symptoms become, potentially requiring longer stays in state hospitals. Simply put, front-end delays in transferring an individual found incompetent to an appropriate facility often cause back-end delays in restoring their competency to proceed.

71. Besides inflicting tremendous suffering on people with disabilities, these delays both increase the risk that DCF treatment will be extended and that sustained competency restoration may no longer be possible. Such potential outcomes come at increased costs to the public and delayed or diminished opportunities to ensure justice for crime victims.

72. Indeed, by the time many people found incompetent go through incompetency proceedings; wait months for DCF to admit them to state mental health facilities; receive restoration treatment in DCF facilities; and return to jails and proceed toward trial until courts adjudicate their offenses; they often serve more time, at greater cost to their overall health and the public purse, than if they had been sentenced at the

outset. This is especially true for people with the most severe psychiatric disabilities who cannot remain competent long enough to stand trial while confined in jail conditions, and so repeatedly cycle through incompetency proceedings, treatment delays, and restorative hospital stays for years to the great detriment of all.

## VIII. SPECIFIC EXAMPLES OF PEOPLE FOUND INCOMPETENT WHO HAVE DETERIORATED IN JAILS WHILE WAITING FOR TRANSFER TO APPROPRIATE CARE

73. Due to DCF's ongoing pattern of delaying admission to appropriate treatment, Plaintiffs' clients and constituents suffer from serious mental health symptoms and devastating consequences, as demonstrated by the following examples:

***"A.A."***

74. A.A. waited over seven months for DCF to admit him to a state hospital, while suffering from severe mental health symptoms and using considerable county jail and local treatment resources. A.A. was arrested in Duval County, Florida on January 27, 2025, on a second-degree felony charge. He was booked into the John E. Goode Pretrial Detention Facility the same day.

75. Soon after his arrest, before he was even arraigned, A.A.'s public defender filed a motion to determine his competency to stand trial, and the court appointed an expert to examine him and issue a report. The expert opined that A.A. was incompetent to proceed, emphasizing that "given his psychiatric condition and significant level of distress, it would be ideal to have [A.A.] transported to the state hospital as soon as feasibly possible." The court issued an order finding A.A. to be incompetent and

committed him to a state hospital on June 2, 2025, an order that DCF received the following day.

76. From June to November 2025, A.A.'s mental and physical health significantly deteriorated while he waited at the jail for transfer to a state hospital. Due to his mental illness, A.A. stopped taking his psychiatric medications and refused to eat, causing him to lose nearly 80 pounds (from 220 to 142 pounds). On November 10, 2025, jail staff transported A.A. to a Jacksonville hospital, where he was involuntarily civilly committed to a mental health inpatient unit. The inpatient records confirmed that A.A. was "malnourished," had been "reducing weight drastically," and had not been taking his medications.

77. Though A.A.'s civil commitment was neither part of his criminal proceeding nor his criminal court order finding him incompetent, A.A. remained under civil commitment at the local inpatient psychiatric facility for six weeks. During that time, A.A. received no competency restoration training and no reports were issued to the court regarding his competency to stand trial. His placement at the civil commitment facility simply prolonged the duration of his confinement until he could be admitted to a state hospital for competency restoration services.

78. After he returned to jail from the local hospital on December 22, 2025, still waiting for DCF to admit him to an appropriate state hospital, jail staff reported that A.A. was again refusing his medication and refusing to eat within a week of his return. DCF forced him to wait another four weeks in the jail, for a total of seven months after the order finding him incompetent, before admitting him to a state hospital where he

remained in DCF custody until July 2026. Once he returned to the jail, A.A.'s mental health symptoms again rapidly deteriorated until he was found incompetent a second time on August 20, 2026. DCF is currently forcing A.A. to suffer a second hospital admission delay in intolerable jail conditions.

***"A.B."***

79. DCF forced A.B. to wait 181 days in the Marion County Jail after the court found her incompetent and committed her to a state hospital on December 18, 2025.

80. Over the course of DCF's six-month hospital admission delay, A.B.'s untreated psychosis and related behaviors led jail staff to isolate her in solitary confinement at least seven times. In January 2026, during one incident that resulted in solitary confinement, correctional officers sprayed A.B. with chemical agents to stop her from fighting with her cellmate.

81. A.B. also suffered from several incidents of overwhelming psychiatric distress while DCF delayed competency restoration services. In one incident, A.B. experienced a panic attack so severe that jail staff transported her to an outside medical hospital. In at least three other incidents, A.B. had to endure highly restrictive suicide prevention measures because her symptoms manifested into threats of harm to herself or others. It was not until DCF finally admitted A.B. to hospital-level care that her symptoms stabilized so that she could progress toward competency restoration.

***"A.C."***

82. DCF forced A.C. to wait 154 days in the Bay County Jail after the court found her incompetent and committed her to a state hospital. This delay was in addition

to the several months she spent in a failed attempt at jail-based competency restoration services.

83. When A.C. arrived at the Bay County Jail on May 12, 2025, mental health staff documented that she had stopped taking antipsychotic medications and was grossly psychotic, illogical, and unable to discern if she was restrained or not. The court subsequently found her incompetent and ordered her to jail-based competency restoration services at the Bay County Jail on July 29, 2025.

84. Upon later re-evaluation, however, the forensic evaluator concluded that A.C. was making no progress toward competency restoration in the jail. The evaluator also opined that A.C. required a state hospital setting due to her lack of progress, emotional and behavioral instability, and inconsistent compliance with her prescribed treatment regimen. The court then committed A.C. to the state hospital on November 26, 2025. But she remained in the jail for over five more months, until DCF finally admitted her to a state hospital on April 29, 2026.

85. During DCF's 154-day hospital admission delay, jail staff struggled to ensure that A.C. took her psychiatric medications and to treat her delusional and paranoid behaviors. They housed A.C. in solitary confinement where she received little to no outdoor recreation and only 30 minutes of out-of-cell activities three days a week. Otherwise, she spent 24 hours a day locked in her cell, alone. Six separate times, mental health staff also placed A.C. in even more restrictive housing as suicide precautions due to her threats to hang herself with her bed sheet.

86. A.C.'s mental health disability also caused her to disobey commands or act aggressively, leading correctional officers to use force. Twice, officers sprayed her with chemical agents for "acting out" or refusing orders. Jail staff also used "high-risk restraints," similar to the "Pro-Straint Restraint Chair"[10] depicted below, at least six times in response to symptomatic, aggressive or self-harmful behaviors caused by her mental health disability, including one restraint that lasted over 10 hours.



87. A.C. lost 42 pounds in less than a year, possibly related to her propensity to grab her meal tray through the cell flap and fling it against the wall. A.C. also suffered from a persistent rash on her back that worsened due to symptoms of her mental illness until she required regular wound care from jail nursing staff.

88. Once DCF finally admitted her to a state hospital, A.C.'s mental health had deteriorated so severely that she could not participate in her intake meeting. A.C. began to stabilize and progress toward successful competency restoration only after receiving appropriate care in a hospital setting.

[10] "The Pro-Straint Restraint Chair provides law enforcement and medical personnel with an option to physically restrain individuals who may be impaired, violent, or otherwise uncontrollable such that they pose a risk to themselves or others. It features 8 points of restraint which provide varying degrees of restraint to accommodate numerous situations. The Pro-Straint Restraint Chair is commonly used in prisons, jails, correctional facilities, police and sheriff departments, and psychiatric hospitals." Pro-gard Products LLC., https://pro-gard.com/product/pro-straint-restraint-chair/ (archived here on September 11, 2026).

***"A.D."***

89. DCF forced A.D. to wait 131 days in the Indian River County Jail after the court found her incompetent and committed her to a state hospital. During this time, A.D.'s mental health symptoms became so severe that jail staff *twice* asked DCF for priority hospital admission. DCF denied both requests.

90. As A.D. waited over four months for state hospital admission, jail staff isolated her in solitary confinement. Jail staff were also completely unable to engage A.D. in mental health treatment or convince her to accept psychiatric medications. For days at a time, A.D. laid and rocked in her bed or paced around her small cell while muttering to herself. Sometimes jail staff could make out delusions in her speech, but often she was incomprehensible. Frequently, due to her untreated mental illness, jail staff strapped her into a restraint chair to prevent her from hurting herself or others. Jail staff were also unable to ensure A.D. maintained her own hygiene. At one point, A.D. because so malodorous that jail staff forcibly showered her.

91. After over four months of suffering from untreated mental health symptoms in solitude, A.D.'s mental health status and self-hygiene had decompensated to such a significant degree that DCF had to forcibly medicate her upon admission.

***"A.E."***

92. DCF forced A.E. to wait 116 days in the Leon County Detention Facility after the court found him incompetent and committed him to a state hospital, despite receiving notice that his mental health had deteriorated so severely that he was repeatedly dunking his head into a toilet filled with vomit and feces.

93. A.E. began having frequent police contact in September 2024, when he was charged with attempting to batter a police officer. A.E. subsequently received new charges when, while completely nude, he allegedly harmed an officer who had responded to A.E.'s siblings' 911 call for help with his mental health crisis in April 2025. A.E. also allegedly lunged at and grabbed a nurse in the psychiatric ward of a Tallahassee hospital in November 2025.

94. By November 17, 2025, the court found A.E. incompetent on all of his pending felonies and committed him to a state hospital. While A.E. waited in jail for DCF to admit him, it quickly became obvious that the jail could not provide the level of mental health treatment and medication management he required. Without access to sufficient levels of mental health care, the jail housed A.E. in solitary confinement for the entirety of his time at the jail. Refusing all medications and showers, A.E. spent hours over many days kneeling over his cell toilet, sticking his head in feces and vomit-filled toilet water, and laughing at himself. Sometimes he dunked his food into the toilet, spread it onto the cell floor, and ate it. A.E. lost between 35 and 50 pounds while waiting to be admitted to competency restoration services.

95. Though A.E.'s counsel notified DCF of his dire mental status and requested priority admission, DCF refused. Instead, DCF waited four months after A.E. was found incompetent to admit him to an appropriate state hospital.

***"A.F."***

96. DCF forced A.F. to wait 117 days in the Marion County Jail after the court found him incompetent and committed him to a state hospital. A.F. is diagnosed with a

mental illness and has never worked or lived independently from his parents due to his mental health needs. A.F.'s mental health symptoms are typically stable when he takes his medications; but when he does not, he becomes paranoid, delusional, and hyper-sensitive to others touching him, sometimes panicking and responding physically.

97. Since he was a teenager, when he was not taking his medications, A.F. has been repeatedly civilly committed under Florida's Mental Health Act or otherwise admitted to mental health treatment facilities. A.F.'s first arrests began in 2024 for three misdemeanor battery charges, for which he was found incompetent. In June 2025, A.F. was charged with felony battery charges for allegedly striking a hospital attendant and struggling with responding police officers while he was forced into treatment at a mental health treatment facility under a civil commitment order. On October 8, 2025, he was found incompetent on these charges.

98. Upon his transfer to the Marion County Jail, A.F. had not taken his medications in over four weeks. Jail intake staff recommended housing him in solitary confinement due to his behaviors at the hospital, while mental health staff emphasized that he required a higher level of care than available at the jail. Due to his mental illness, once in solitary confinement, A.F. frequently refused both treatment and medications, often standing naked in his cell, staring blankly, and refusing to speak. Also, due to his mental illness, A.F. often threatened or engaged in self-harm, including punching the walls of his cell until he gave himself chronic hairline fractures, severe swelling, and bruising to his hands.

99. At least six times, in response to A.F.'s suicidal behaviors, jail staff housed him in extreme isolation, leaving him naked with nothing but an anti-suicide smock and mattress in his cell. At least nine times, in response to his inability to comply with verbal commands, correctional officers used force against him, including by tasing him three times and spraying him with chemical agents twice. Six of those nine use-of-force incidents occurred after the court found him incompetent to proceed and ordered him to a state hospital. After one use-of-force incident, A.F. arrived in the jail infirmary with a bloody white bag over his head, a swollen-shut and bruised eye, swollen jaw and forehead, and a scraped elbow. A.F. received additional felony charges after allegedly attacking correctional officers who entered his cell in response to his threats of self-harm or inability to comply with orders.

100. By the time DCF finally admitted A.F. to a state hospital on February 3, 2026, over three months after its statutorily required deadline, A.F. was so delusional and psychotic that hospital staff could not conduct their initial assessment. At first, A.F. continued to refuse medications, suffer from suicidality and other acute mental health symptoms, and respond aggressively to hospital staff. But unlike at the jail, hospital clinicians were able to administer involuntary psychotropic medications five times without chemical agents, tasers, or additional physical force or injuries to A.F. or staff. Once stabilized on his medications, A.F. became cooperative and compliant and was able to progress through treatment and competency training at an appropriate mental health facility.

***"A.G."***

101. DCF forced A.G. to wait 119 days in the Leon County Detention Facility after the court found him incompetent and committed him to a state hospital.

102. A.G. is a 23-year-old male diagnosed with serious mental illness and an intellectual disability. He also has a history of eight prior competency evaluations with multiple orders finding him incompetent dating back to 2017. Through his earlier incompetency orders, A.G. has cycled through all possible settings for competency restoration services, including a juvenile youth camp, community-based competency restoration services through both DCF and the Agency for Persons with Disabilities, and a forensic treatment bed through the Developmental Disabilities Defendant Program at Florida State Hospital. In June 2025, a forensic evaluator determined that A.G. required competency restoration services through DCF in a state hospital due to his ongoing mental health symptoms, medication non-compliance, lack of insight into his mental illness, and pressing need for psychiatric treatment.

103. While A.G. waited for four months in jail for DCF to admit him to a state hospital, jail mental health staff were unable to ensure A.G. consistently took his medications or complied with treatment, exacerbating his severe depression, anxiety, and unpredictable behaviors. In response to at least 10 psychiatric-related outbursts, correctional officers used discipline, force, and solitary confinement against A.G. Four of these outbursts occurred after his incompetency order. Of note, 117 days after the incompetency order, A.G. was involved in a physical altercation with another incarcerated person that led correctional officers to use physical force and chemical

agents and resulted in a new felony battery charge against him. DCF finally admitted A.G. to a state hospital two days after this physical altercation.

***"A.H."***

104. DCF forced A.H. to wait 119 days in the Palm Beach County Jail after the court found him incompetent and committed him to a state hospital.

105. Upon his jail intake on March 2, 2025, A.H. was experiencing tremors, hallucinations, delusions, and suicidal and homicidal thoughts. His symptoms were so severe that intake staff requested a mental health evaluation on the day of his arrest, leading to the jail's diagnoses of dementia, bipolar disorder, and schizophrenia. The court eventually found him incompetent on September 10, 2025, but DCF did not admit A.H. to a state hospital until four months later, on January 7, 2026.

106. While awaiting state hospital admission, jail staff were unable to ensure that A.H. took his psychiatric medications, nor did they successfully engage him in the mental health assessments they attempted through his cell door. As a result, A.H.'s mental health symptoms continued to worsen. During one of A.H.'s three multi-day placements on suicide watch, mental health staff observed A.H. talking to himself, picking at his mattress as he searched for insects (possibly related to his in-jail scabies and lice diagnoses), rocking back and forth, and trembling. Throughout his jail stay, A.H. had poor hygiene, including unkempt, matted hair on his face and head. A.H. was also involved in at least five altercations with other incarcerated people, including one incident in which someone punched A.H. in the face after A.H. threw the first punch.

107. DCF's admission delay also left jail staff to manage A.H.'s food and weight-related issues for months beyond when he should have been in DCF custody. Though jail staff observed that A.H. was eating, sometimes even stealing other people's food, A.H. lost weight at a rapid rate, leading to the jail's diagnosis of low Body Mass Index (under 19) on November 11, 2025. By the time DCF admitted him four months after the court's incompetency order, A.H.'s weight had reduced from his jail-entry weight of 150 pounds to 122 pounds.

***"A.J."***

108. DCF forced A.J. to wait 104 days in the Osceola County Correctional Facility after the court found him incompetent and committed him to a state hospital. Due to his mental illness, A.J. has a history of threatening violence against government and healthcare officials. In 2020, for example, A.J. was so desperate for mental health care that he was accused of calling and threatening a local police department unless officers helped him access treatment from a community mental health treatment facility.

109. During his most recent incarceration, according to a jail psychiatrist, A.J. suffered from chronic psychosis with paranoid delusions that were not responding to medications alone. The jail psychiatrist determined that A.J. required psychotherapy and other treatment regimens that were unavailable in jail. Despite the jail's inability to meet A.J.'s treatment needs, DCF forced A.J. to wait over three months after the court's incompetency finding before admitting him from the jail to a state hospital.

110. While DCF delayed state hospital admission, A.J. harmed or attempted to harm himself at least five times, including by banging his head against his cell door and

threatening to cut his wrists. A.J. also stopped showering and brushing his teeth. In addition, consistent with his mental health and arrest history, A.J. repeatedly threatened jail staff. With its limited resources, jail staff responded to these disability-related behaviors by either isolating A.J. in highly restrictive suicide prevention cells or solitary confinement.

111. A.J.'s delusions and paranoia, among other symptoms, worsened as he languished in unbearable jail conditions. One of A.J.'s fixed delusions in the jail was that an outside agency was sending him audio messages through a wi-fi signal in his cell. Over the course of just one month in solitary confinement, A.J.'s string of written requests to jail staff progressed from him simply asking the source of the hallucinatory messages to desperate pleas to stop the voices and beeps that were harassing him day and night, keeping him from sleeping, and making him feel physically ill. Jail staff noted that external factors such as nearby construction may have been contributing to A.J.'s symptoms but were unable to provide treatment that significantly reduced his suffering before DCF finally admitted him to appropriate care.

***"A.K."***

112. DCF forced A.K. to wait 82 days in the Sarasota County Correctional Facility after the court found him incompetent and committed him to a state hospital. During his initial competency evaluation on March 12, 2026, the forensic mental health evaluator documented that A.K. was experiencing acute psychotic symptoms including ongoing and intrusive auditory hallucinations, disorganized and racing thoughts, and poor impulse control. She further noted that he was not following his treatment plan, which

was likely the cause of his exacerbating psychosis in the jail. She concluded that A.K. was unlikely to show significant improvement at the jail so long as he continued to refuse his medications.

113. As A.K.'s psychiatric symptoms worsened, the jail could not manage them, and he engaged in disability-related behaviors that were dangerous to himself and others. Most notably, A.K.'s untreated auditory hallucinations and other bipolar disorder-related symptoms led to allegations that he repeatedly, and without obvious provocation, attacked other incarcerated people in the middle of the night while they were asleep. These behaviors resulted in eight new felony battery charges and one misdemeanor charge for resisting an officer without violence.

114. A.K. also frequently made suicidal statements and injured himself by, for example, bashing his head against the cell floor and wall. His consistent symptomatic behavior and unpredictable attacks led jail staff to strap him into a four-point restraint chair for hours, sometimes *days*, at a time on at least ten occasions. For example, on May 26, 2026, correctional staff documented that they left him in a restraint chair for *35 hours* with only two restroom breaks and one meal. In four other incidents, correctional staff strapped him into a restraint chair for 30 hours, 26 hours, six hours, and five hours, respectively. Jail staff also responded to A.K.'s untreated symptomatic behavior with tasers, chemical agents, solitary confinement, and a three-day hospitalization in a community mental health treatment facility under Florida's Mental Health Act.

115. Since DCF admitted A.K. to a state hospital on June 8, 2026, his mental health symptoms have led to altercations with other patients. But hospital staff have been

able to de-escalate these incidents without force or solitary confinement, and A.K. has not received criminal charges since his hospital admission.

***"A.L."***

116. A.L. died in the Duval County jail while waiting for DCF to admit him to a state hospital. He died four weeks after the statutory deadline for transfer had passed.

117. After his January 2024 arrest for violating the terms of his probation, A.L.'s mental and physical condition visibly and dramatically declined. When A.L. refused to eat for at least three days, jail staff transported him to a Jacksonville hospital, where he was civilly committed under Florida's Mental Health Act to an inpatient unit in May 2024. Upon his discharge back to the jail, the inpatient clinicians warned that without appropriate psychiatric care, A.L. was at substantial risk of neglect and harm to himself. Shortly thereafter, the court found him incompetent on June 6, 2024.

118. Over the next six weeks, as A.L. waited for DCF to admit him to an appropriate state hospital, his health continued to deteriorate. Due to his mental illness, he refused to eat, bathe, or take his prescribed medications. Four weeks after DCF's statutory deadline to admit him to a state hospital passed, A.L. died in his jail cell from hyponatremic dehydration, typically caused by drinking excessive amounts of water.

***"A.M."***

119. A court last found A.M. incompetent and ordered her to a state hospital on July 17, 2025, but she was killed in jail before DCF admitted her.

120. A.M. had previously cycled through the Duval County jail several times for misdemeanors from 2017 to 2022. On December 6, 2022, she was arrested again for a

second-degree felony. The court found her incompetent and A.M. eventually spent almost a year in a DCF facility, as well as months in a jail that was struggling with critical levels of understaffing. Nearly two years after her arrest, A.M. pled guilty, received a prison sentence of 673 days with credit for time served, and was released.

121. Less than a year later, on April 22, 2025, A.M. was charged with three misdemeanors. Unable to post bond, she remained in the jail where she did not take her medications and behaved aggressively toward other incarcerated people. On May 11, 2025, the State charged her with a new felony after she allegedly attacked another incarcerated person. By July 17, 2025, the court found her incompetent and ordered her to receive restorative treatment in a DCF facility.

122. Nearly a month later, on August 15, still waiting in the jail to receive that treatment, A.M. was severely beaten by her cellmate. She was pronounced brain dead on August 18, 2025. A.A.'s organs were harvested and she was officially pronounced deceased on the same date.

## CAUSE OF ACTION
## Fourteenth Amendment to the U.S. Constitution
## Violation of Substantive Due Process

123. All paragraphs preceding the Cause of Action section are incorporated as if they are fully set forth herein.

124. The Fourteenth Amendment to the United States Constitution prohibits states from depriving any person of life, liberty, or property without due process of law.

125. People who have been charged with, but not convicted of, criminal offenses and adjudicated incompetent have liberty interests in freedom from incarceration and punishment. They also have a liberty interest in timely competency restoration services.

126. To ensure that people found incompetent are not punished, due process requires that the nature and duration of confinement bear a reasonable relationship to the purpose for which an individual is confined.

127. Once an individual is found incompetent, all criminal proceedings must stop. At that point, the only lawful purpose for which a person found incompetent may be confined is to receive competency restoration services.

128. DCF, not county jails, is required to provide people found incompetent with the restorative treatment required by state law. No legitimate state interest justifies DCF's continued confinement of people found incompetent in county jails where DCF denies them restorative treatment for months on end at risk of worsening mental health conditions. This is especially true when the Florida Legislature has authorized DCF to divert at least some of this population to forensic alternative treatment centers, yet DCF has made few efforts (and in most counties in the state, no effort) to provide these options to individuals with mental illness languishing in county jails.

129. DCF's broken forensic system forces people who are not convicted of crimes to endure punishment in jail for months, rather than to receive state-mandated restorative treatment in therapeutic mental health treatment facilities.

130. Once an individual is found unable to aid and assist in their own defense, the only lawful purpose for confinement is to treat them to return the individual to

competency. Based on the 15-day deadline for state hospital admission set forth in Florida law, DCF's past ability to comply with that deadline, and the harms that people found incompetent suffer while they languish in county jails, the months-long confinement in county jails that results from DCF's state hospital admission delays bears no reasonable relationship to the purpose of competency restoration.

131. By requiring people who are found incompetent to proceed and who are committed to state mental health facilities to remain in county jails for protracted periods and by failing to provide restorative treatment in a reasonably timely manner, DCF has violated the Fourteenth Amendment due process rights of Plaintiff's clients and constituents.

132. Unless enjoined by the Court, DCF will continue to violate the constitutional rights of Plaintiff's clients and constituents found incompetent to proceed and committed to state hospitals.

**PRAYER FOR RELIEF**

133. Plaintiff's clients and constituents have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of DCF as alleged herein, unless the Court grants Plaintiff the relief it requests. DCF's policies and practices are the direct cause of the violations of the Fourteenth Amendment to the United States Constitution alleged herein.

134. WHEREFORE, Plaintiff, on behalf of its clients and constituents, respectfully requests that this Court:

a. Adjudge and declare that the conditions, acts, omission, policies, and practices of Defendant and DCF's agents, officials, employees, and all persons acting in concert with them, are in violation of the rights of Plaintiff's clients and constituents under the Fourteenth Amendment to the U.S. Constitution;

b. Permanently enjoin Defendant and DCF's agents, officials, employees, and all persons acting in concert with them, from continuing the unlawful acts, conditions, and practices described in this Complaint;

c. Order Defendant and DCF's agents, officials, employees, and all persons acting in concert with them to develop and implement, as soon as practical, a remedial plan to ensure that incompetent persons committed to state mental health facilities are admitted to appropriate competency restoration treatment within a reasonable amount of time of courts' commitment orders;

d. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

e. Award Plaintiffs, under 42 U.S.C. §§ 1988 and 12205, the costs of this suit and reasonable attorneys' fees and litigation expenses; and

f. Award such other and further relief as the Court deems just and proper.

Dated: September 16, 2026

Respectfully Submitted,

*/s/ Kelly Knapp*
Kelly Knapp*
Florida Bar No. 1011018
Email: kelly.knapp@splcenter.org
Southern Poverty Law Center
2 S. Biscayne Blvd., Suite 3200
Miami, FL 33131-1804
Telephone: (305) 537-0575

*/s/ Dante Trevisani*
Dante Trevisani
Florida Bar No. 72912
Email: dtrevisani@fji.law
Florida Justice Institute, Inc.
40 NW 3rd St., Suite 200
Miami, FL 33128-1839
Telephone: (786) 342-6911

*/s/ Caitlyn Clibbon*
Caitlyn Clibbon
Florida Bar No. 1011014
Email: caitlync@disabilityrightsflorida.org
Disability Rights Florida
2473 Care Dr., Suite 200
Tallahassee, FL 32308-9803
Telephone: (850) 488-9071

*/s/ Curtis Filaroski*
Curtis Filaroski
Florida Bar No. 111972
Email: curtisf@disabilityrightsflorida.org
Disability Rights Florida
1000 N Ashley Dr., Suite 640
Tampa, FL 33602-3701
Telephone: (850) 488-9071

*/s/ Ray Taseff*
Ray Taseff
Florida Bar. No. 352500
Email: rtaseff@fji.law
Florida Justice Institute, Inc.
40 NW 3rd St., Suite 200
Miami, FL 33128-1839
Telephone: (786) 342-6911

*/s/ Rebecca Ramaswamy*
Rebecca Ramaswamy**
Email: rebecca.ramaswamy@splcenter.org
Southern Poverty Law Center
400 Washington Ave.
Montgomery, AL 36104
Telephone: (504) 535-9035

*/s/ Gabriella Marquez*
Gabriella Marquez
Florida Bar. No. 1059018
Email: gabriellam@disabilityrightsflorida.org
Disability Rights Florida
2400 E Commercial Blvd., Suite 525
Fort Lauderdale, FL 33308-4006
Telephone: (850) 488-9071

*/s/ Allison Horwitz*
Allison Horwitz**
Email: ahorwitz@tpmlaw.com
Terris, Pravlik & Millian, LLP
1701 K Street, NW, Suite 500
Washington, DC 20006-1525
Telephone: (202) 682-2100

*/s/ Michael L. Huang*
Michael L. Huang**
Email: mhuang@tpmlaw.com
Terris, Pravlik & Millian, LLP
1701 K Street, NW, Suite 500
Washington, DC 20006-1525
Telephone: (202) 682-210

**Attorneys for Plaintiff**

* Application for admission to the Southern District submitted on September 2, 2026
** *Pro hac vice* application forthcoming