**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 26-26377-CIV-ALTONAGA/Reid**

DISABILITY RIGHTS FLORIDA, INC.,

Plaintiff,

v.

KATHRYN WILLIAMS, in her official capacity as Interim Secretary of the Florida Department of Children and Families,

Defendant.
_______________________________________/

**DEFENDANT'S MOTION TO DISMISS**
**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), Defendant Kathryn Williams, as Interim Secretary of the Florida Department of Children and Families (the "Secretary"), respectfully moves to dismiss the First Amended Complaint (the "Complaint") filed by Disability Rights Florida, Inc. ("DRF").

## INTRODUCTION

The Court should dismiss the Complaint because (1) DRF lacks Article III standing to pursue the prospective relief it seeks, as it has not identified any DRF member, or constituent, with a live, redressable injury; and (2) the Complaint fails to plausibly allege a violation of any DRF constituent's due-process rights, and state-law rights may not be enforced under 42 U.S.C. § 1983.

According to the Complaint, DRF is the protection-and-advocacy ("P&A") organization in Florida and sues in a representational capacity on behalf of its constituents who have been found incompetent to proceed and are awaiting transfer from county jails to state forensic mental health treatment facilities. ECF No. 12 ¶ 14. All but one of the constituents described in

the Complaint, however, were transferred from jails and admitted to state forensic facilities *before* DRF ever filed this action. Thus, any injury associated with their wait is not traceable to DCF and cannot be redressed by the forward-looking relief that DRF requests. The sole remaining constituent's alleged injury is likewise not traceable to or redressable by the Secretary. DRF's own allegations show that any backlog can be cured only by an appropriation of funds to support the additional beds that DRF claims are required. *Id.* ¶¶ 41–47. DRF alleges that 98 percent of beds in state forensic facilities are filled—well above the industry standard—and that 2,000 more beds are needed, but does not allege that DCF has either resources or authority to construct new state forensic facilities with 2,000 beds. *Id.* ¶¶ 45, 47–48. And the Complaint says next to nothing about the current confinement of the one constituent who is still awaiting admission to a state forensic facility; it pleads A.A.'s current confinement in a single, bare-bones sentence, describing a one-month wait without alleging any surrounding circumstances. *Id.* ¶ 78. That allegation does not plausibly allege a violation of due process under any standard. Thus, the Complaint should be dismissed for lack of standing and, alternatively, for failure to state a claim.

## BACKGROUND

Under section 916.12(1) of the Florida Statutes, a "defendant is incompetent to proceed . . . if the defendant does not have sufficient present ability to consult with her or his lawyer with a reasonable degree of rational understanding or if the defendant has no rational, as well as factual, understanding of the proceedings against her or him." A defendant "who is charged with a felony and who is adjudicated incompetent to proceed may be involuntarily committed for treatment" if certain criteria set out in statute are met. *See* § 916.13(1), Fla. Stat. When a court finds the defendant incompetent to proceed and commits the defendant for treatment in a forensic facility, it transmits a commitment packet to the Florida Department of Children and Families ("DCF"). *Id.* § 916.107(1)(a). Under state law, a jail may serve as an "emergency facility" for 15 days after DCF receives the completed commitment order. *Id.* As an alternative to forensic facilities, the Legislature has authorized a "Forensic Hospital Diversion Pilot Program" in five counties. *See id.* § 916.185. But as DRF acknowledges, only the program in Miami-Dade County is operational, and it has 16 treatment beds. ECF No. 12 ¶ 31.

DRF alleges that, on average, DCF exceeds the 15-day deadline by more than 100 days

and maintains a statewide waitlist that has fluctuated between 650 and 881 people awaiting admission. *Id.* ¶¶ 4, 32, 45. The Complaint's own allegations tie the size of the waitlist to the number of funded forensic beds and to bed capacity, which it alleges has not kept pace with the growth in forensic commitments. *Id.* ¶¶ 40–45. The Complaint also alleges a series of legislative appropriations directed at bed capacity, including $126 million in 2022 and, in Fiscal Year 2025–2026, "another $78 million to DCF to expand bed capacity." *Id.* ¶¶ 43, 46. DRF relies on a 2025 Behavioral Health Gap Analysis projecting that the State's forensic facilities must "add at least 1,602 additional forensic beds within the next five years," and as many as 2,034, to meet demand. *Id.* ¶ 47. DRF alleges that 98 percent of current beds are filled, although the industry standard is 85 percent, and alleges a "projected gap of 2,000 forensic state hospital beds." *Id.* ¶¶ 45, 47, 48.

As a P&A organization, DRF claims to sue "on behalf of its clients and constituents" who have been adjudicated incompetent to proceed and are awaiting transfer. *Id.* ¶¶ 12, 18. It alleges that it interviewed at least 129 constituents, that 108 of them waited an average of at least 124 days, 79 waited more than 100 days, and 29 waited more than 150 days. *Id.* ¶ 20. It further alleges that, on "any given day, at least 150" people found incompetent are waiting for transfer. *Id.* ¶ 11.

The Complaint then describes twelve individuals by initials. Nine were admitted to state forensic facilities before DRF filed suit: A.B., A.C., A.D., A.E., A.F., A.G., A.H., A.J., and A.K. ECF No. 12 ¶¶ 79, 82, 89, 92, 96, 101, 104, 108, 112. Two others—A.L. and A.M.—died in jail before their admission. *Id.* ¶¶ 116, 119. Only A.A. is alleged to be presently confined in jail and awaiting admission. A.A. was arrested on January 27, 2025, on a second-degree felony charge. *Id.* ¶ 74. He was found incompetent on June 2, 2025; the Complaint alleges that A.A. was later admitted to a state forensic facility and remained in DCF custody until July 2026. *Id.* ¶¶ 75, 78. After returning to jail, A.A. was found incompetent a second time on August 20, 2026. *Id.* ¶ 78. The Complaint, filed 28 days later on September 17, 2026, alleges in one sentence that "DCF is currently forcing A.A. to suffer a second hospital admission delay in intolerable jail conditions." *Id.* As of September 17, A.A.'s second period awaiting admission had spanned four weeks. *Id.*

DRF pleads a single cause of action, expressly captioned "Violation of Substantive Due Process" under the Fourteenth Amendment to the U.S. Constitution. *Id.* at 39. It seeks only

prospective relief: a declaration that DCF's "conditions, acts, omission, policies, and practices" are unconstitutional; a permanent injunction against "continuing the unlawful acts, conditions, and practices"; and an order directing DCF to "develop and implement . . . a remedial plan." *Id.* ¶¶ 134.a.–c.

## LEGAL STANDARD

### A. Rule 12(b)(1).

Because standing is a component of subject-matter jurisdiction, "a dismissal for lack of standing has the same effect as a dismissal for lack of subject matter jurisdiction under" Federal Rule of Civil Procedure 12(b)(1)." *Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (quoting *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1203 n.42 (11th Cir. 1991)). The "triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Id.* (quoting *Parker v. Scrap Metal Processors, Inc.,* 386 F.3d 993, 1003 (11th Cir. 2004)). That burden rests on the "party who seeks the exercise of jurisdiction in his favor," who must "clearly . . . allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990), *holding modified by City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004). Standing "cannot be 'inferred argumentatively from averments in the pleadings' but 'must affirmatively appear in the record.'" *Id.* (first quoting *Grace v. Am. Cent. Ins. Co.*, 109 U.S. 278, 284 (1883); and then quoting *Mansfield C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884)) (citation modified). As the party invoking jurisdiction, DRF "bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citing *FW/PBS*, *Inc.*, 493 U.S. at 231).

A Rule 12(b)(1) motion may raise either a "facial" or a "factual" attack on subject-matter jurisdiction. *McElmurray v. Consol. Gov't of Augusta-Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007). This motion presents a *facial* attack: even accepting the Complaint's well-pleaded allegations as true, DRF has not alleged facts plausibly showing that a DRF constituent has standing or that the requested relief would redress the alleged injury. A facial attack requires the Court to determine whether the "plaintiff has sufficiently alleged a basis of subject matter

jurisdiction, and the allegations in his complaint are taken as true for the purposes of the motion." *Lawrence v. Dunbar*, 919 F.2d 1525, 1529 (11th Cir. 1990). A court generally "evaluate[s] standing based on the facts alleged in the complaint." *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335–36 (11th Cir. 2013) (citation omitted), presuming that "general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (citation omitted).

**B. Rule 12(b)(6).**

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible only when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 556). The court disregards "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," and "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 678–79 (citations omitted). The Eleventh Circuit has identified a two-step approach: the court first disregards allegations that are "merely legal conclusions" and then, taking the remaining well-pleaded factual allegations as true, asks whether they "plausibly give rise to an entitlement to relief"—and in doing so may credit an "obvious alternative explanation" for the conduct alleged. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (citations omitted).

The plausibility standard applies not only to the Complaint's allegations of liability, but also to the Complaint's allegations of injury in fact, traceability, and redressability for purposes of Article III standing. *Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1337 (11th Cir. 2021).

## ARGUMENT

Article III of the United States Constitution limits the "judicial power," and therefore the jurisdiction of federal courts, to "cases" and "controversies." U.S. Const. art. III, § 2. The doctrine of standing is "an essential and unchanging part of the case-or-controversy

requirement." *Lujan*, 504 U.S. at 560 (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To invoke that jurisdiction, the litigant must plead and eventually prove three elements: (1) "an injury in fact" that (2) "is fairly traceable to the challenged action of the defendant" and that (3) "will be redressed by a favorable decision." *Id.* at 560–61 (citations omitted) (citation modified). Flowing from these requirements is "a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy v. Missouri*, 603 U.S. 43, 57–58 (2024) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)).

That principle operates most forcefully on the second and third elements of standing: causation and redressability. "To satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560). Redressability demands that "it is likely, not merely speculative, that a favorable judgment will redress [the] injury." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019) (en banc) (citing *Lujan*, 504 U.S. at 561). The court asks whether a decision in the plaintiff's favor would "significantly increase . . . the likelihood" that the plaintiff "would obtain relief that directly redresses the injury." *Id.* at 1301 (quoting *Harrell v. Fla. Bar*, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010)) (citation modified). Critically, "it must be *the effect of the court's judgment on the defendant*—not on an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Id.* (quoting *Digit. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 958 (8th Cir. 2015)). A redressability showing becomes "substantially more difficult to establish" when the injury arises from the government's allegedly unlawful regulation or lack of regulation of someone else, because redressability then "hinge[s] on the response of the regulated (or regulable) third party." *Lewis*, 944 F.3d at 1304–05 (quoting *Lujan*, 504 U.S. at 562).

Behind these limits is a core principle adopted by the Supreme Court and the Eleventh Circuit: "Redressability requires that the court be able to afford relief *through the exercise of its power*, not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 825 (1992) (Scalia, J., concurring in part and concurring in judgment)); *Lewis*, 944 F.3d

at 1305 (same). "It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland*, 599 U.S. at 294.

## I. DRF Lacks Associational Standing Because It Has Not Shown That Any Constituent Has Standing to Sue.

### A. Associational Standing Does Not Dispense with Article III.

Under *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977), an association has standing to sue on behalf of its members only when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." In *Doe v. Stincer*, 175 F.3d 879, 886 (11th Cir. 1999), the Eleventh Circuit concluded that a P&A organization such as DRF "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members."[1]

But representational standing does not displace Article III. As *Stincer* made clear, the right to sue on behalf of its constituents does not relieve an organization of its obligation to plausibly

[1] *Stincer*'s conclusion that a P&A organization may sue on behalf of its constituents, as though it were a membership organization, is far from settled law across circuits. Earlier this year, the Fourth Circuit noted a circuit split and held that P&A organizations possess "none of *Hunt*'s three indicia of membership." *S.C. State Conf. of the NAACP v. S.C. Dep't of Juv. Just.*, 165 F.4th 858, 864 (4th Cir. 2026). The full court granted rehearing en banc, 169 F.4th 542 (4th Cir. 2026), and heard oral argument in September 2026, Doc. 72, Case No. 25-1032 (4th Cir. Sep. 14, 2026).

Although at least one district court has characterized *Stincer* as "squarely h[olding] that P&As may sue on behalf of the constituents they serve," *Dunn v. Dunn*, 219 F. Supp. 3d 1163, 1167 (M.D. Ala. 2016), whether *Stincer*'s reasoning on this issue constitutes a holding is questionable. In *Stincer*, the court ultimately concluded that the P&A organization did not have standing because it did not show that any of its constituents was injured. 175 F.3d at 888. And "[w]hat matters in discerning whether a rule of law expounded by a court is in fact holding is whether it was necessary to the result reached, or, in the alternative, could be discarded without impairing the foundations of the holding." *United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009). The only rule of law strictly necessary to *Stincer*'s holding was that a membership organization must show "that one of its constituents otherwise had standing to sue." *See* 175 F.3d at 886. To find that no constituent had standing, the court might as well have assumed, without deciding, that the P&A organization was a membership organization, rendering its opinion on that point unnecessary to the result that it reached. For purposes of this motion, however, the Secretary does not question whether DRF is a membership organization under *Hunt* and *Stincer*.

show that one of its constituents had standing. *Id.* (citing *Lujan*, 504 U.S. at 561). That is a constitutional requirement: a constituent must have suffered "a concrete injury that is traceable to the challenged" conduct and that "could be redressed by a favorable decision in this action." *Id.* at 887.

In *Stincer* itself, the Eleventh Circuit vacated relief for the P&A organization because the evidence was insufficient to show that a P&A constituent suffered an injury in fact. *Id.* The organization's allegations that "many Floridians" were being denied access to their mental health records did not establish that any constituent "suffered a concrete injury that is traceable to the challenged statute and could be redressed by a favorable decision." *Id.* (citing *United Food*, 517 U.S. at 555). The Eleventh Circuit reaffirmed the rule in *National Alliance for the Mentally Ill, St. Johns Inc. v. Board of County Commissioners for St. Johns County*, 376 F.3d 1292, 1296 (11th Cir. 2004), holding that an organization's "failure to identify an injured constituent prevents [the organization] from asserting associational standing" and affirming dismissal for lack of standing. *See also Lamb v. Charlotte County*, 429 F. Supp. 2d 1302, 1311 (M.D. Fla. 2006) (applying the same principle and dismissing an organization's suit because its "failure to maintain a member who has standing to sue is fatal" where associational standing is the organization's sole basis to sue).

**B. DRF Has Not Alleged a Constituent With Standing to Obtain the Prospective Relief It Seeks.**

DRF sues solely in a representational capacity on behalf of its constituents who it claims have been found incompetent and are awaiting transfer from jails to state forensic facilities. ECF No. 12 ¶ 18. It seeks only prospective relief. *Id.* ¶¶ 8, 134.b. Because DRF's standing turns on the standing of its constituents, it must plausibly allege that at least one constituent suffers an actual or imminent injury that is not only concrete, particularized, and traceable to DCF, but also redressable by prospective relief. *See Stincer*, 175 F.3d at 887. The Complaint does not make that showing.

First, every constituent the Complaint describes by initials, other than A.A., either was admitted to a forensic facility, or died, before DRF even filed this action. A.B., A.C., A.D., A.E., A.F., A.G., A.H., A.J., and A.K. waited varying lengths of time but were all admitted. ECF No. 12 ¶¶ 79, 82, 89, 92, 96, 101, 104, 108, 112. None was confined in jail when this action was filed. *Id.* A.L. and A.M. died while awaiting admission. *Id.* ¶¶ 116, 119.

As to each of these eleven constituents, the alleged injury (delayed admission) is complete and in the past. Prospective declaratory and injunctive relief cannot redress a past injury. *Lamb*, 429 F. Supp. 2d at 1307 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing present adverse effects." (quoting *Lujan*, 504 U.S. at 564)). Because injunctions regulate future conduct, "a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate . . . threat of *future* injury." *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) (emphasis in original). An constituent who is already admitted (or deceased) cannot satisfy that requirement.

Second, DRF's allegations describe the challenged practices only in the aggregate and do not tie a concrete, redressable injury to any identifiable, presently situated constituent. DRF alleges that it interviewed at least 129 constituents and that 108 of them waited an average of at least 124 days, with 79 waiting over 100 days and 29 waiting over 150 days. ECF No. 12 ¶ 20. It further alleges that, on "any given day, at least 150" people found incompetent are waiting for transfer within this district. *Id.* ¶ 11. These are precisely the kind of generalized allegations that the Eleventh Circuit held insufficient in *Stincer*, where allegations that "many Floridians" were being harmed did not establish that any constituent had suffered a concrete injury traceable to and redressable by the defendant. 175 F.3d at 887. Although a P&A organization need not name the constituents on whose behalf suit is brought, it must at least "allege that one of its . . . constituents has suffered an injury that would allow it to bring suit in its own right." *Id.* at 885. Average wait times and daily headcounts do not identify a constituent who is awaiting admission, whose continued confinement is traceable to DCF, and whose injury the requested injunction would redress.

### C. A.A. Cannot Save the Complaint.

That leaves A.A., who is the only DRF constituent the Complaint alleges to be presently confined and awaiting admission. ECF No. 12 ¶¶ 74–78. For two distinct reasons developed in the following sections, A.A. cannot rescue the Complaint from dismissal. First, A.A.'s alleged injury is not traceable to or redressable by the Secretary because the alleged backlog is a function of bed capacity and appropriations that DCF does not control. *See infra* Part II. Second, the Complaint's lone, conclusory allegation of A.A.'s current confinement, which references a wait

of roughly one month, does not plausibly allege a due-process violation under any standard, let alone the shock-the-conscience standard that governs the substantive due-process claim DRF elected to plead. *See infra* Part III.

The Complaint's defects are especially clear when compared to authority addressing even longer delays. A court in this district recently held that a *five-month* pre-hospitalization delay, which was caused by the lack of an available bed, did not violate due process, because such a delay "bears reasonable relation to the purpose of [the] commitment." *United States v. Olson*, 812 F. Supp. 3d 1312, 1315 (S.D. Fla. 2025). And the Eleventh Circuit has pointedly declined to hold that the Due Process Clause caps pre-hospitalization wait times at all, reserving "resolution of that issue for a case in which it is properly presented." *United States v. Alhindi*, 97 F.4th 814, 826 n.4 (11th Cir. 2024). There is thus no binding authority establishing that a one-month wait—or any particular wait—offends due process, and DRF's allegations as to A.A. are so meager that they fail to plausibly allege that, in A.A.'s circumstances, a one-month wait violates due process.

## II. **DRF's Claim Fails the Independent Requirements of Traceability and Redressability.**

Even if DRF could identify a constituent with an injury, its claim fails the independent requirement of redressability. A plaintiff must show that it is "likely," not "merely speculative," that the injury "will be redressed by a favorable decision." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1205 (11th Cir. 2021). Redressability turns on "the effect of the court's judgment on the defendant—not an absent third party." *Lewis*, 944 F.3d at 1301; *accord Berrocal v. Att'y Gen. of U.S.*, 136 F.4th 1043, 1052 (11th Cir. 2025). Here, DRF's own allegations establish that the cure for the alleged injury lies not with the Secretary, but with the only entity that can appropriate the resources and authorize the beds that DRF concedes are required. Because DRF has not plausibly alleged any redress that the Secretary can afford, the Court should dismiss the Complaint.

### A. The Requested Relief Will Not Redress the Alleged Injury.

DRF seeks three forms of relief: (1) a declaration that DCF's conditions, acts, omissions, policies, and practices violate the Fourteenth Amendment; (2) a permanent injunction against "continuing the unlawful acts, conditions, and practices"; and (3) an order directing DCF to "develop and implement . . . a remedial plan." ECF No. 12 ¶ 134. None of this relief, including

the obey-the-law injunction, describes a concrete, court-orderable act. Simply put, the Complaint does not plausibly allege that the Secretary has the means to afford the redress that DRF seeks.

Ordering a "plan" is not a remedy. An order to develop and implement a remedial plan does not admit a single person to a forensic bed or create a single bed; it directs DCF to produce a document. But DRF cannot shift its burden to plausibly allege redressability to DCF by seeking an order directing the Secretary to devise the means of redress. The condition that DRF alleges, that individuals found incompetent will "languish and suffer in county jails without competency restoration treatment," *id.* ¶ 32, will persist until the supply of beds meets the demand. At best, an order to devise a plan makes redress "possible, instead of significantly more likely," which does not suffice. *Berrocal*, 136 F.4th at 1053. As the Supreme Court has explained, it "is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland*, 599 U.S. at 294. A request for a "remedial plan" seeks the court's opinion through a declaration of unlawfulness, not a judgment that itself remedies the harm.

### B. Redress Depends on Third-Party Decisions Beyond the Secretary's Control.

The governing principle is settled and dispositive here: a federal court's judgment binds only the defendant, and an injury is not redressable when the conduct that causes it is controlled by independent actors not before the court. *Jacobson*, 974 F.3d at 1253–54; *Lewis*, 944 F.3d at 1301, 1304–05. Where redressability "depends on the unfettered choices made by independent actors not before the courts," standing "is ordinarily 'substantially more difficult' to establish," and the plaintiff must show that "those choices will be made in such a manner as to produce causation and permit redressability of injury." *Lujan*, 504 U.S. at 562 (citations omitted). The persuasive effect of a judgment on absent non-parties is not enough: "[a]ny persuasive effect a judicial order might have upon . . . absent nonparties who are not under [the defendant's] control, cannot suffice to establish redressability." *Berrocal*, 136 F.4th at 1052 (quoting *Jacobson*, 974 F.3d at 1254). The Eleventh Circuit has applied that rule to deny standing in a series of suits against public officials who did not control the conduct causing the injury. *See id.* at 1053–54 (no redressability where a foreign sovereign, not the defendant officials, controlled whether the challenged prosecutions would continue); *Support Working Animals*, 8 F.4th at 1205 (judgment

against the Florida Attorney General would not redress injury because she had no enforcement authority and the judgment would "bind only her, and not other parties not before this Court," leaving the challenged law on the books); *Jacobson*, 974 F.3d at 1254 (declaratory judgment against the Secretary "does not bind the Supervisors, who are not parties" and who print the ballots); *Lewis*, 944 F.3d at 1301–02 (holding that minimum-wage employees who sued the Alabama Attorney General rather than their employers over a state statute voiding city's wage ordinance lacked standing because the injury was not traceable to or redressable by the Attorney General).

District courts in this circuit have done the same. *Univ. of S. Fla. Coll. Republicans v. Sec'y of Com.*, 839 F. Supp. 3d 1102, 1123 (M.D. Fla. 2026) (holding that plaintiffs lacked standing to challenge the 2020 Census methodology against the Commerce defendants because redress of their vote-dilution and funding-loss injuries depended on non-party actors such as the President, Congress, and state redistricting bodies); *Walt Disney Parks & Resorts U.S., Inc. v. DeSantis*, 716 F. Supp. 3d 1216, 1222–23 (N.D. Fla. 2024) (holding that Disney lacked standing to sue the Governor and the Florida Secretary of Commerce over the restructuring of its special district because the Governor's past board appointments were not an imminent, redressable injury and only the board members who actually exercised the challenged control were proper defendants); *Nat'l Fed'n of Blind of Ala. v. Allen*, 661 F. Supp. 3d 1114, 1123 (N.D. Ala. 2023) (an ADA suit against the Alabama Secretary of State failed for lack of redressability because non-party county election managers, not the Secretary, administer ballots); *Air Methods Corp. v. Altmaier*, No. 4:20-cv-462-AW-MAF, 2021 WL 6303231 (N.D. Fla. Oct. 12, 2021) (injury from a no-balance-billing provision was not redressable by the Insurance Commissioner, who does not enforce it, where non-party insureds could still invoke it); *Henry v. DeSantis*, 461 F. Supp. 3d 1244, 1252 (S.D. Fla. 2020) (holding that a laid-off employee lacked standing to sue the Governor because employer's own workforce decision, not the Governor's COVID-19 executive orders, caused her job loss).

*Jacobson* is on point. There, voters challenged a statute that determined the order in which candidates' names appear on the ballot but sued only the Florida Secretary of State, even though the county Supervisors of Elections, who are "independent officials under Florida law who are not subject to the Secretary's control," designed and printed the ballots. 974 F.3d at 1253. The Eleventh Circuit held that neither injunctive nor declaratory relief against the Secretary could

redress the injury because the judgment "does not bind the Supervisors, who are not parties to this action," and any persuasive effect on them "cannot suffice to establish redressability." *Id.* at 1254. So too here: the Secretary does not control the appropriations and bed authorizations that DRF's theory requires, and a judgment against the Secretary would not constrain the Legislature.

DRF's own allegations confirm the point. It asserts that the harm flows from insufficient capacity in state forensic facilities. ECF No. 12 ¶ 41 (acknowledging that there are not "enough forensic treatment beds . . . to meet demand"). It claims a "projected gap of 2,000 forensic state hospital beds," *id.* ¶ 48, and alleges that DCF has filled 98 percent of current beds, even though a "sustainable and industry-standard occupancy rate is 85%." *Id.* ¶¶ 45, 47. DRF relies on a projection that the State must add between 1,602 and 2,034 forensic beds to meet demand. *Id.* ¶ 47. DRF's allegations also establish that bed capacity turns on legislative funding. DRF alleges a series of appropriations to expand capacity, including $126 million in 2022 and another $78 million in 2025, but it claims that capacity still has not kept pace with demand. *Id.* ¶¶ 41, 43, 46.

These are allegations about legislative appropriations and hospital construction, which the Secretary does not control. DRF nowhere alleges that sufficient beds exist or can be created within DCF's budget, that funds have been appropriated to build and staff the roughly 1,600 to 2,000 beds it says are needed, or that any specific, lawful act within DCF's existing authority and resources would remedy the injury. The Supreme Court has cautioned that where a suit against an executive agency rests on a policy's "indirect effects on state revenues or state spending," the claim for standing "can become more attenuated." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). DRF's resource theory suffers from precisely that defect.

Florida law confirms the point. In Florida, an executive agency has no authority to spend beyond the appropriation made by the Legislature: "No money shall be drawn from the treasury except in pursuance of appropriation made by law." Art. VII, § 1(c), Fla. Const. Thus, "the solution to these funding problems is legislative in nature, not judicial," and "it is not the judiciary's role to revise legislative appropriations." *Dep't of Health & Rehab. Servs. v. State*, 593 So. 2d 328, 329 (Fla. 5th DCA 1992). Section 216.311, Florida Statutes, bars any state agency from contracting to spend "in excess of the amount appropriated to such agency . . . unless specifically authorized by law," rendering any such contract "null and void." *See also Dep't of Health & Rehab.*

*Servs.*, 593 So. 2d at 328 n.1. And DCF cannot exercise any authority that the Legislature has not expressly conferred on it: "It is axiomatic that statutorily-created agencies have only such power as is conferred by statute." *City of Jacksonville v. Jack. Supervisor's Ass'n, Inc.*, 791 So. 2d 508, 511 (Fla. 1st DCA 2001). These principles rebut DRF's allegation that the Secretary "has the legal authority to implement the relief sought herein"—relief that DRF does not describe. ECF No. 12 ¶ 22. The Secretary's authority does not include the power to appropriate funds, construct hospitals without prior legislative sanction, or expand a pilot program beyond its statutory scope.

Other non-parties also impact the availability of hospital beds. For example, the speed with which individuals are discharged and capacity is created for new admissions depends largely on courts and sheriffs. Once the forensic facility determines that an individual is competent to proceed, the administrator must report to the court, and the court must conduct a competency hearing within 30 days. Fla. Stat. § 916.13(2)(d); Fla. R. Crim. P. 3.212(c)(6). The sheriff must transport the individual to the court's jurisdiction within seven days after the defendant is found competent. Fla. Stat. §§ 916.107(10)(a), 916.13(2)(d). Unless these tasks are performed timely, bed capacity is needlessly exhausted. The Complaint fails to plausibly allege that pre-admission wait times are traceable to or redressable by DCF rather than independent actors not before this Court.

### D. The Diversion Pilot Program Does Not Supply Redressability.

DRF suggests in passing, and without factual enhancement, that DCF could reduce the waitlist by diverting individuals under the Forensic Hospital Diversion Pilot Program authorized by section 916.185. ECF No. 12 ¶ 31. The statute is not sufficient to establish redressability. The pilot program is authorized only in five counties—Broward, Duval, Hillsborough, Miami-Dade, and Okaloosa—and DCF "may" implement it only "if existing resources are available to do so on a recurring basis." § 916.185(3)(a), (c), Fla. Stat. DRF concedes that the pilot program exists only in Miami-Dade County and has only 16 treatment beds. ECF No. 12 ¶ 31. DRF does not allege that any of the 16 beds is available or that existing resources are available to implement the program in the other four counties. Against a statewide waitlist of 650 to 880 individuals, *id.* ¶ 4, a 16-bed program in one county cannot redress the alleged statewide injury, and DCF cannot unilaterally expand the pilot program beyond the five counties or existing resources. *See Ga.*

*Advoc. Off. v. Georgia*, No. 1:17-cv-3999-MLB, 2024 WL 4340034, at *21 (N.D. Ga. Sep. 27, 2024) (concluding that state officials had no authority to afford redress because state law committed the challenged decisions to local actors not before the court). DRF's threadbare allegation that the Legislature "has authorized DCF to divert at least some of this population" but that "DCF has made few efforts" to do so, ECF No. 12 ¶ 128, says nothing about resource availability or whether any efforts that DCF could make within its budget would "significantly increase" the likelihood that DRF "would obtain relief that directly redresses the injury." *Lewis*, 944 F.3d at 1301.

## III. <u>The Complaint Fails to State a Claim Under Rule 12(b)(6)</u>.

DRF also fails to state a due-process claim. As noted above, eleven of twelve constituents identified in the Complaint are not awaiting transfer to a forensic facility. And the Complaint's one allegation about A.A.'s current confinement is insufficient to plausibly allege that A.A.'s detention is unconstitutional. Finally, to the extent DRF seeks to convert Florida's statutory 15-day deadline into a federal constitutional right enforceable under section 1983, its claim fails as a matter of law.

A.A. is the only constituent described in the Complaint who even arguably has standing because A.A. is the only one alleged to be currently confined and awaiting admission. But the Complaint's allegations about A.A.'s current confinement are insufficient to state a plausible due-process claim. *See* ECF No. 12 ¶ 78. The Complaint's allegations about A.A. mostly describe a prior, completed episode: after a seven-month wait, A.A. was admitted and "remained in DCF custody until July 2026." *Id.* ¶¶ 75, 78. His current confinement rests on a second incompetency finding entered August 20, 2026. *Id.* ¶ 78. As to his current confinement, the Complaint alleges only that A.A.'s mental-health symptoms "rapidly deteriorated" after his return to jail in July 2026 and that "DCF is currently forcing A.A. to suffer a second hospital admission delay." *Id.* The Complaint alleges that the "jail conditions" are "intolerable" but does not elaborate. *Id.* The Complaint was filed on September 17, 2026, four weeks after A.A. was found incompetent on August 20, 2026. *Id.* A.A.'s one-month wait is alleged without any further supporting detail. *Id.*

The bare allegation of a one-month wait is insufficient, without more, to plausibly allege a due-process violation. No bright-line rule holds that a one-month wait offends due process.

In fact, courts have rejected challenges to pre-admission waiting periods of three, six, seven, eight, nine, and even twelve months. *United States v. Rendon-Romero*, 738 F. Supp. 3d 697, 703 (E.D.N.C. 2024) (collecting cases). To plausibly allege a due-process violation, therefore, DRF must do more than allege a one-month wait. It must provide sufficient factual enhancement to plausibly show that, under A.A.'s circumstances, a one-month wait exceeds constitutional limits. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (citation modified)). The unadorned, naked assertion that A.A. has remained in jail for one month since he was found incompetent does not nudge DRF's claim of a substantive due-process violation "across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

The Complaint makes no allegations, for example, that would permit an inference that A.A.'s roughly one-month wait is unreasonable. It does not allege why A.A. remains confined, the basis for his detention, the State's available capacity, A.A.'s treatment during this period, or A.A.'s mental-health condition. The gap is especially consequential because the Complaint does not even allege that A.A. is confined "solely on account of" his incompetency. *Ind. Prot. & Advoc. Servs. Comm'n v. Ind. Fam. & Soc. Servs. Admin.*, 630 F. Supp. 3d 1022, 1031–32 (S.D. Ind. 2022). A.A. was arrested on a second-degree felony charge and booked into pretrial detention. ECF No. 12 ¶ 74. Where a detainee was already in jail on pretrial detention and simply kept there, the detention "predates the incompetency finding and is justified by some independent ground." *Ind. Prot. & Advoc. Servs. Comm'n*, 630 F. Supp. 3d at 1032. The Complaint does not allege that A.A. would be at liberty but for the incompetency finding, or that no independent ground, such as the pending felony charge, flight risk, or danger to society supports A.A.'s detention. Absent such allegations, the Complaint admits the "obvious alternative explanation" that A.A.'s confinement is lawful pretrial detention and therefore fails to state a plausible claim. *Id.* at 1290.

A court in this district rejected a due-process challenge in a case that featured a longer wait than the one pleaded here. *Olson*, 812 F. Supp. 3d at 1315. In *Olson*, the defendant waited about five months in pre-admission detention "because there was no space for him" at the designated treatment facility. *Id.* The court concluded that this five-month delay, caused by the lack of an available bed, was reasonable under the circumstances and did not violate due process.

*Id.*

DRF's chosen framing further compounds the problem. DRF did not plead a procedural due-process claim, but rather captioned its single cause of action as a "Violation of *Substantive* Due Process." ECF No. 12 at 39 (emphasis added). Because it chose to bring a substantive due-process claim, DRF is bound by the demanding standard that governs such claims. The Supreme Court has long held that executive action violates the substantive component of the Due Process Clause only when it is "arbitrary, or conscience shocking, in a constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998). "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846. Negligence is "insufficient to make out a constitutional due process claim," and "even intentional wrongs seldom violate the Due Process Clause." *Waddell v. Hendry Cnty. Sheriff's Off.*, 329 F.3d 1300, 1305 (11th Cir. 2003) (citing *Sacramento*, 523 U.S. at 846). Substantive due process requires "an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Sacramento*, 523 U.S. at 850.

This Court has already applied that exacting standard to a competency-admission delay—and a delay far longer than A.A.'s. In *United States v. Lee*, No. 1:21-cr-20034, 2022 WL 18275882 (S.D. Fla. Dec. 27, 2022), *report and recommendation adopted*, 2023 WL 168755 (S.D. Fla. Jan. 12, 2023), Magistrate Judge Damian concluded that a *five-month* pre-admission delay did not violate due process because the government's conduct was not "so egregious or outrageous 'that it may fairly be said to shock the contemporary conscience.'" *Id.* at *5 (quoting *Sacramento*, 523 U.S. at 847 n.8). This Court affirmed and adopted Judge Damian's report, expressing "full agreement with Judge Damian's comprehensive analysis and recommendations." 2023 WL 168755, at *1.

If a five-month delay did not shock the conscience in *Lee*, then a one-month delay alleged in one conclusory sentence without factual enhancement does not plausibly show a violation of due process. And this Court's reasoning in *Lee* applies with equal force here for a second reason: as in *Lee*, A.A. "is already being held in pretrial detention," so his case "is different from those in which the only basis for holding the defendant was incompetency." 2022 WL 18275882, at *5.

DRF's claim that *Jackson v. Indiana*, 406 U.S. 715 (1972), applies is mistaken. In *Jackson*, a criminal defendant sought to be *discharged* from a forensic facility because there was no chance

his competency would ever be restored. In contrast, DRF asks that its constituents be *admitted* to forensic facilities because there *is* a chance—and indeed a substantial probability—that their competency *will* be restored. *Jackson* concerned the exact opposite of the scenario presented here and a markedly different question: what should be done with defendants in forensic facilities whose competency cannot be restored?

In *Jackson*, a defendant who was incompetent to proceed had lived in a forensic facility for more than three years. *Id.* at 738. Because his "chances of . . . ever meeting the competency standards" were "at best minimal, if not nonexistent," *id.* at 727, his commitment in a forensic facility had become "indefinite," *id.* at 737. The Court held that, when a defendant is committed to a forensic facility "solely on account of incapacity," his "continued commitment" must be justified by progress toward the competency-restoration goal and may not continue if there is no longer a "substantial probability that he will attain that capacity in the reasonable future." *Id.* at 738. After more than three years in a forensic facility, and with no prospect of restoration, the defendant's commitment in that facility no longer bore a "reasonable relation to the purpose for which the individual was committed"—namely, to the purpose of competency restoration. *Id.*

This case and *Jackson* present inverse questions. DRF asks that its constituents be *admitted* to forensic facilities—not *discharged* from them. And it claims that its constituents' competency *can* be restored—not that it *cannot*. *Jackson*'s repeated references to the defendant's "indefinite" commitment makes clear that the Court was focused on defendants who were incompetent but who were "stuck" in forensic facilities because restoration of their competence was hopeless or improbable.

Any application of the rule announced in *Jackson* would be incongruous here for other reasons as well. First, *Jackson* applies only when a defendant was committed to a forensic facility "solely on account of his incapacity." *Id.* at 738. In *Jackson*, the defendant was admitted to the forensic facility solely for that reason. But DRF does not allege that its constituents were *jailed* solely because of incompetency. They were jailed because they were arrested on felony charges. DRF does not allege that, but for the finding of incompetency, A.A. would not be where he is.

Second, *Jackson* held that, once competency restoration is not substantially probable, the defendant must be discharged from a forensic facility. This rule was satisfied in *Jackson* because

the defendant's restoration was futile and his stay in a forensic facility had therefore become indefinite. But the same rule has no application here. DRF does not allege that its constituents' competency cannot be restored. Rather, DRF *wants* its constituents to be admitted to forensic facilities precisely because it believes their competency *will* be restored. Indeed, whenever a judge enters any commitment order, the judge finds "a substantial probability that the mental illness causing the defendant's incompetence will respond to treatment and the defendant will regain competency to proceed in the reasonably foreseeable future." Fla. Stat. § 916.13(1)(c); *accord* Fla. R. Crim. P. 3.212(c)(3)(B).

Decades after the Supreme Court decided *Jackson*, the Ninth Circuit extended *Jackson* to criminal defendants detained in jail before their admission to forensic facilities. *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101 (9th Cir. 2003). Some courts outside the Ninth Circuit have followed *Mink* without questioning *Jackson*'s applicability to defendants awaiting admission to forensic facilities.

Recently, however, a stay panel of the Fifth Circuit correctly concluded that *Jackson* likely does not apply in that context. *See* Ex. A. The Court concluded that "*Jackson*'s focus on post-hospitalization confinement was crucial" because its "reasonableness test was explicitly designed to evaluate the permissibility of continued hospitalization, given the possibility that detainees could be held indefinitely even after their hospital professionals had determined them unlikely to regain competency." *Id.* at 4. The Fifth Circuit found "no way to evaluate" whether detainees who "have yet to begin competency-restoration treatment" were "substantially unlikely to regain competency." *Id.* The extension of *Jackson* to defendants awaiting admission to forensic facilities was "probable error because, at least, of the factual differences between this case and *Jackson*." *Id.*

*Jackson* does not apply for the additional reason that *Jackson* was a procedural due-process case. *Youngberg v. Romeo*, 457 U.S. 307, 321 n.27 (1982) (describing *Jackson* as a "procedural due process case involving the validity of an involuntary commitment"). Although some courts have blended these concepts, procedural and substantive due process are not two names for the same thing. DRF may not plead a substantive due-process claim but invoke a procedural due-process standard.

Even if *Jackson* applies, however, the Complaint comes up short. Because the Complaint

alleges only that A.A. has waited one month for admission to a forensic facility, it does not plausibly satisfy any standard of reasonableness gleaned from *Jackson*. The reasonableness of a one-month wait depends on facts that the Complaint does not even colorably address. Thus, under any standard, DRF has failed to plausibly allege a violation of A.A.'s due-process rights.

Finally, to the extent DRF's claim alleges an asserted failure to meet Florida's statutory requirement that individuals found incompetent to proceed be admitted to a forensic facility within 15 days, *see* Fla. Stat. § 916.107(1)(a), that theory fails as a matter of law. DRF brings this action under 42 U.S.C. § 1983 to redress an alleged deprivation of federal constitutional rights. ECF No. 12 ¶ 9. Section 1983 does not reach violations of state law, and federal courts may not enjoin state-law violations by state officials. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 124 (1984). As to state-law violations, States maintain their Eleventh Amendment immunity. And courts in this circuit reject attempts to disguise violations of state law as violations of federal law. *See S&M Brands, Inc. v. Georgia ex rel. Carr*, 925 F.3d 1198, 1205 (11th Cir. 2019); *DeKalb Cnty. Sch. Dist. v. Schrenko*, 109 F.3d 680, 688–90 (11th Cir. 1997). A violation of Florida's 15-day benchmark, standing alone, is not a federal constitutional injury and cannot be remedied through section 1983.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint. DRF has not identified any constituent with a live, redressable injury, and, far from plausibly showing that redress lies within DCF's control, DRF's allegations reveal that redress of the alleged injuries depends on funding decisions beyond DCF's authority, defeating jurisdiction under Rule 12(b)(1). Independently, the Complaint fails to state a claim under Rule 12(b)(6): its lone allegation of A.A.'s one-month confinement does not plausibly allege a due-process violation under any standard, but least of all under the shock-the-conscience standard that governs the substantive due-process claim that DRF chose to plead. Nor can DRF enforce Florida law's 15-day admission deadline in this action. The Secretary respectfully requests that the Court dismiss the First Amended Complaint.

## CERTIFICATE OF CONFERRAL

Counsel for the Secretary has conferred with counsel for DRF in a good-faith effort to resolve the issues raised in this motion but has been unable to do so.

Dated October 28, 2026.

Respectfully submitted,

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
abardos@shutts.com
Nicholas J.P. Meros (FBN 120270)
nmeros@shutts.com
Margaret A. McCormick (FBN 1039517)
mmcormick@shutts.com
SHUTTS & BOWEN LLP
215 South Monroe Street, Suite 804
Tallahassee, Florida 32301
Telephone: (850) 241-1717

*Counsel for Defendant, Interim Secretary Williams*